John R. HILDEBRAND,
Plaintiff-Appellant,

v.

**BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY, et al.,**
Defendants-Appellees.

No. 80–1618.

United States Court of Appeals,
Sixth Circuit.

Argued June 3, 1981.

Decided Oct. 19, 1981.

Rehearing and Rehearing En Banc
Denied Dec. 1, 1981.

Kenneth Laing, MacLean, Seaman, Laing & Guilford, Lansing, Mich., for plaintiff-appellant.

Leland W. Carr, Jr., Anderson, Carr, Street & Hornbach, Lansing, Mich., Byron M. Higgins, Michigan State University, East Lansing, Mich., for defendants-appellees.

Before WEICK and KEITH, Circuit Judges, and HORTON,* District Judge.

KEITH, Circuit Judge.

Plaintiff John R. Hildebrand was denied tenure at Michigan State University in 1968. Since then, he has tried to reverse his denial of tenure in a variety of forums. The plaintiff claimed that he was denied tenure in retaliation for the exercise of his first amendment rights. The jury below agreed with his claims. The district court overturned the jury's decision and entered judgment in favor of the defendant University. We affirm.

## I.

This case is before us for the second time. In the initial appeal, we reversed and remanded because of procedural errors. *Hildebrand v. Board of Trustees of Michigan State University*, 607 F.2d 705 (6th Cir. 1979). On remand, the case was tried before a jury. The jury concluded: 1) that certain intra-departmental activity engaged in by Dr. Hildebrand was protected by the First Amendment; 2) that Dr. Hildebrand was denied tenure because he engaged in this protected activity; and 3) that the defendant University had not shown that Dr. Hildebrand would have been denied tenure absent the protected activity. The jury awarded back pay, compensatory and punitive damages, and directed that Dr. Hildebrand be reinstated.[1]

* Hon. Odell Horton, United States District Judge for the Western District of Tennessee, sitting by designation.

1. The jury ruled against the plaintiff's claims that he had been denied due process in his tenure denial. This ruling is fully supported by the record and is not challenged on appeal.

2. Dr. Hildebrand received his Bachelor's Degree from the University of California at Berkeley, a Master's Degree from George Washington University, and a Ph.D. in Economics

The district court entered judgment on the jury's verdict and directed that Dr. Hildebrand be reinstated at Michigan State University ("Michigan State"). The defendants then filed motions for judgment notwithstanding the verdict (J.N.O.V.), or in the alternative, for a new trial. The district court issued an opinion on September 9, 1980, granting defendants' motion for judgment notwithstanding the verdict. The district court also conditionally granted defendants' motion for a new trial. The plaintiff has appealed from that judgment. The district court has directed that Dr. Hildebrand's reinstatement be continued pending this appeal.

## II. FACTS

Dr. Hildebrand was a tenured professor of Economics at Texas. Technological University.[2] In 1967, he accepted a position as Associate Professor of Social Science at Michigan State.[3] He also had a joint appointment at Michigan State's Latin American Studies Center. Dr. Hildebrand's post as Associate Professor was a "tenure track" position. His Associate Professorship was to last for two years. He would acquire tenure if he was reappointed after this two year period.

Dr. Hildebrand started teaching at Michigan State in the Fall of 1967. At that time, the Department of Social Sciences prescribed severe curriculum requirements. Professors in the department were expected to teach social science courses according to a prescribed curriculum, and were required to administer a standardized examination. Dr. Hildebrand criticized these requirements. He thought that they substantially restricted his teaching.

from the University of Chicago. Dr. Hildebrand spent several years as a Professor of Economics at Kansas State University, except for a short period when he served as a member of the Kansas legislature. He also spent eighteen months in Latin America, after which he joined Texas Tech's economics department.

3. Dr. Hildebrand's wife was also a professor at Texas Tech, and joined him in the move to Michigan State. She received tenure at Michigan State, and is currently teaching there.

During 1967 and 1968 Michigan State was expanding its faculty. Over half the members of the department were untenured. Dr. Hildebrand and some of his untenured colleagues decided that the department needed a different perspective. As a consequence, they decided to run for a position on the Departmental Advisory Committee (DAC). The DAC was composed of five elected faculty members. It served as a department curriculum committee and advised the department chairman on various departmental matters, including tenure. Until 1968, a majority of the membership of the DAC was always tenured faculty.

Three untenured faculty members were supported as candidates for the DAC. These candidates were Drs. Puhek, Wagman, and Hildebrand. Each was elected. The election of these three untenured faculty members, combined with one holdover non-tenured DAC member resulted in a DAC in which four out of five members were non-tenured. Some faculty members greeted this sudden change in the composition of the DAC with consternation. They thought that there had been block voting by the non-tenured faculty.

On June 23, 1968, a joint meeting took place between the old DAC and the incoming DAC. Dr. Clinton A. Snyder, who acted as secretary at the Advisory Committee meetings, spoke up at this meeting. He stated that the outcome of the DAC election was due to a conspiracy among certain faculty members, and that this was a "rotten or stinking fish". Dr. Douglas Dunham, the department chairman, was sufficiently disturbed by the DAC election result that he called in the untenured faculty members to discuss the DAC election with them.

While this controversy over the DAC election brewed, Dr. Hildebrand's tenure determination was approaching. Dr. Hildebrand met with Department Chairman Dunham on June 2, 1968. The two men had what was apparently a full and frank dis-

cussion. At that meeting, Dr. Hildebrand formally requested that he be considered for tenure.

The tenure process at Michigan State in 1967 went as follows: The department chairman consulted with the DAC concerning the tenure candidate's suitability for tenure. Following this input, the department chairman forwarded his written recommendation to the Dean of the College in question.[4] The Dean would meet with the department chairman to discuss the recommendation. The Dean could reject the department's recommendation or forward it with his concurrence to the academic vice-president of the University, the Provost. The Provost would review the case and add his recommendation. The recommendations were then forwarded to the President of the University. The Board of Trustees took the final action on tenure.

The Department Chairman ordinarily consults with the DAC on tenure decisions. In Dr. Hildebrand's case, however, Dr. Dunham deviated from the practice of consulting with the DAC in his department. On July 2, 1968, he consulted with the full, tenured professors in the Department concerning Dr. Hildebrand. On that date, the full professors in the Department met with Dr. Dunham and reviewed Dr. Hildebrand's qualifications. These professors voted unanimously to recommend that Dr. Hildebrand not be granted tenure. Dr. Dunham took this recommendation under advisement. At that time, Dr. Hildebrand was away from the University for the summer. On September 11, 1968, Dr. Dunham wrote to the Dean of the College, Dean Edward A. Carlin, recommending that Dr. Hildebrand not be granted tenure. The next day, Dr. Dunham informed Dr. Hildebrand by letter of his recommendation and of the tenured faculty's recommendation at the July 2 meeting. Dr. Hildebrand met with Dr. Dunham and requested that he be allowed to meet with the full professors to try to persuade them to change their views.

4. In 1967, Michigan State had 17 colleges. The University College was one of these. The department of Social Science was one of four departments comprising this college. Edward A. Carlin was the Dean of University College during this time.

Dr. Dunham agreed to this request and arranged a meeting between Dr. Hildebrand and the tenured faculty. Dean Carlin held up action on the tenure issue pending the outcome of the meeting.

The meeting took place on September 23, 1968. Dr. Hildebrand addressed his tenured colleagues and presented the reasons he should be granted tenure. During the meeting, several of the tenured faculty explained their reservations to him. Dr. Hildebrand was then excused and the full professors again deliberated. Once again, the professors voted unanimously to recommend that tenure be denied.[5] Dr. Dunham again concurred in this recommendation, and so informed Dean Carlin. Dean Carlin, endorsed the recommended denial of tenure and forwarded it to the Provost. Final action took place on November 21, 1968 when the Board of Trustees voted to deny tenure to Dr. Hildebrand. Dr. Hildebrand's employment at Michigan State ended on August 31, 1969.

For the past twelve years Dr. Hildebrand has been contesting his denial of tenure in one forum or another. He complained to the American Association of University Professors. He tried a series of intra-University appeals.[6] He also filed two unfair labor practice charges with the Michigan Employment Relations Commission.

In this federal suit, originally filed in 1971, Dr. Hildebrand claimed that he was denied tenure in retaliation for the exercise of his First Amendment rights.[7] Specifically, he claimed that he was denied tenure 1) because he criticized the uniform department curriculum, and 2) because he ran for the DAC. The jury agreed with his claims. The district court did not.[8]

### III.

The law in this area has been outlined in a series of Supreme Court opinions: *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Mt. Healthy School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). The threshold question is whether the plaintiff's conduct deserves constitutional protection. In a public educational setting, a Court applies a balancing test in determining whether conduct is protected by the First Amendment. A court must balance "the interests of the [teacher] as a citizen in commenting upon matters of pub-

---

**5.** It appears that all tenured full professors voted against tenure for Dr. Hildebrand at both the July 2 and September 23 meetings. There may have been one or two tenured associate professors who did not vote on tenure, but the record is not clear.

**6.** Dr. Hildebrand took his case to the DAC, the committee to which he and his untenured colleagues had been elected. The DAC passed a resolution finding no reason for his denial of tenure. Dr. Hildebrand also appealed to the University Faculty Tenure Committee. In addition, in 1972, Dr. Hildebrand sought to utilize reformulated University appeal procedures, but was rebuffed.

**7.** As we note in n.1, *supra*, the plaintiff also claimed that his due process rights were abridged. The jury's adverse finding on this issue is not challenged on appeal.

**8.** In our initial opinion in this case, we commented that the first trial presented a "procedural nightmare". 607 F.2d at 712. On remand, the district court succeeded in turning the second trial into another procedural nightmare. This happened because the district court interpreted our order of reversal and remand for a trial by jury "on all issues" as mandating a jury trial on all legal as well as equitable issues. For this reason, the district court submitted the issues 1) of whether Dr. Hildebrand's conduct was protected by the First Amendment, 2) whether Dr. Hildebrand should be reinstated, and 3) whether Dr. Hildebrand should receive back pay to the jury. The first issue is one of law and should not have been submitted to the jury. It is for the judge to weigh the factors and make a decision as to whether a plaintiff's conduct was protected by the First Amendment. *See Schneider v. City of Atlanta*, 628 F.2d 915 (5th Cir. 1980); *Bernasconi v. Tempe Elementary School Dist. No. 3*, 548 F.2d 857, 862 (9th Cir.), *cert. denied*, 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 82 (1977). Similarly, as was noted in both the majority and concurring opinions, issues relating to reinstatement and back pay are equitable, and thus are decided by the judge.

lic concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Givhan, supra* at 414, 99 S.Ct. at 696, quoting *Pickering, supra*, 391 U.S. at 568, 88 S.Ct. at 1734. If a court finds that an employee's conduct was protected by the First Amendment, the finder of fact must determine whether the employee was fired because he engaged in the protected conduct. The employee's protected conduct must be a "substantial factor" or a "motivating factor" in the employer's decision not to rehire him. *Doyle, supra*, 429 U.S. at 287, 97 S.Ct. at 576. *Givhan, supra*, 439 U.S. at 416, 99 S.Ct. at 697. Once the employee meets this burden, the burden of proof shifts to the employer to prove that the employee would have been fired absent the protected conduct. *Givhan, supra* at 416, 99 S.Ct. at 697; *Doyle, supra*, 429 U.S. at 287, 97 S.Ct. at 576.

In this case, the district court submitted all three issues to the jury. The jury concluded that Dr. Hildebrand's conduct in complaining about the curriculum and running for a seat on the DAC was protected by the First Amendment. The jury further found that this was a substantial reason why Dr. Hildebrand was denied tenure. Finally, the jury found that Dr. Hildebrand would have been granted tenure absent the protected conduct in question.

As noted, the district court granted J.N. O.V. and overturned the jury's decision. The district court also conditionally granted defendants' motion for a new trial. Thus, the key issue is whether the district court properly granted the motion for J.N.O.V.

█ The standard for granting J.N.O.V. is well established. All evidence and inferences therefrom must be read in favor of the party opposing the J.N.O.V. A court cannot weigh the evidence. Only if there is but one reasonable conclusion as to the proper verdict can J.N.O.V. be granted. *See Standard Alliance Industries, Inc. v. Black Clawson Co.*, 587 F.2d 813, 823 (6th Cir. 1978), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979); *Morelock v. NCR Corp.*, 586 F.2d 1096, 1104 (6th Cir. 1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979).

## IV.

The first question is whether Dr. Hildebrand's activities were protected by the First Amendment. We find this issue to be troubling. The *Pickering* balancing test is difficult to apply.[9]

As noted above, there were two separate allegations concerning protected conduct by Dr. Hildebrand. The first concerned Dr. Hildebrand's criticisms of the curriculum.

**9.** *See Schmidt v. Fremont County School Dist. No. 25*, 558 F.2d 982 (10th Cir. 1977) (comments concerning career education policy and football reserved ticket sales not protected by the First Amendment); *Hetrick v. Martin*, 480 F.2d 705 (6th Cir.), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973). *See also D'Andrea v. Adams*, 626 F.2d 469 (5th Cir. 1980), *cert. denied*, 450 U.S. 919, 101 S.Ct. 1365, 67 L.Ed.2d 345 (1981) (statements by professor to legislative officials concerning allegedly improper use of university funds protected by First Amendment); *McGill v. Board of Education of Pekin Elementary School*, 602 F.2d 774 (7th Cir. 1979) (teacher's statements concerning collective bargaining agreement of sufficient public concern to be protected by First Amendment); *Megill v. Board of Regents of State of Florida*, 541 F.2d 1073 (5th Cir. 1976) (series of boisterous, inaccurate public statements by professor not protected by First Amendment).

Decisions in this area vary and are difficult to reconcile. *See, e. g., Atcherson v. Siebenmann*, 605 F.2d 1058 (8th Cir. 1979) (state judge violated probation officer's rights by discharging her for writing a letter alleging misappropriation of funds by coworkers. Disruption in office caused by letter "would not have greatly increased" disharmony in the office.). *Cf. Abbott v. Thetford*, 534 F.2d 1101 (5th Cir. 1976), *(en banc) cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977) (confidential relationship between judge and probation officer disrupted by the latter's conduct); *Tygrett v. Washington*, 543 F.2d 840 (D.C.Cir.1974), *appeal after remand, sub nom., Tygrett v. Barry*, 627 F.2d 1279 (D.C.Cir.1980) (public officer could not be discharged for advocating a "sick-in" or "blue flu" even though police strikes are illegal). *See also Saye v. Williams*, 452 U.S. 926, 101 S.Ct. 3063, 69 L.Ed.2d 428 (1981) Rehnquist, J., dissenting from denial of certiorari to *Williams v. Board of Regents*, 629 F.2d 993 (5th Cir. 1980).

The second concerned Dr. Hildebrand's election to the DAC. However, we need not decide whether the First Amendment protected Dr. Hildebrand's actions. For purposes of this appeal, we shall assume, without deciding, that Dr. Hildebrand's conduct was protected.

■ We agree with the district court that evidence clearly showed that Dr. Hildebrand would have been denied tenure regardless of his First Amendment protected activities.

The tenure process at Michigan State involves many steps. There was no reason for the Dean of the University College, the Provost, or the Board of Trustees to deny tenure or recommend the denial of tenure because of Dr. Hildebrand's activities. The jury apparently agreed, because it ruled in favor of all defendants except Dr. Dunham, the department chairman, and Dr. Snyder, his assistant. Dr. Dunham based his decision on a recommendation received from the department's tenured faculty members.

In July of 1968 he convened all of the *tenured* faculty members who were available to seek their advice as to whether Dr. Hildebrand should be accorded tenure.[10] They voted unanimously that he should not receive tenure.

When Dr. Hildebrand returned from summer vacation, he asked for and received an opportunity to address the tenured faculty to try to convince them to change their recommendation. After hearing his reasons, the tenured faculty again voted unanimously to recommend against his being granted tenure. The tenured faculty's vote was based on their perception that Dr. Hildebrand did not fit into a multi-disciplinary department, but was better suited for a single disciplinary department such as Economics or Latin American Studies. The plaintiff produced no evidence to show im-

permissible motive on the part of any faculty member, other than Dr. Snyder. It is true that Dr. Dunham, as department chairman, recommended that Dr. Hildebrand not be granted tenure. However, he acted pursuant to the tenured faculty's recommendation. That recommendation was advisory in nature.[11] The tenured faculty based their recommendation on constitutionally permissible reasons. As a consequence, under these circumstances Dr. Dunham's recommendation that Hildebrand not be granted tenure cannot be challenged. Therefore, even if we assume that Dr. Hildebrand's conduct was protected by the First Amendment, we hold that his tenure denial was not based upon his exercise of that protected conduct.

We think that the district court acted properly in granting J.N.O.V. Accordingly, we affirm its judgment and direct that the injunction temporarily reinstating the plaintiff be dissolved. Each party shall bear its own costs.

---

**10.** No tenured faculty member was sued, nor were any allegations made that they acted impermissibly in making their unanimous recommendation.

**11.** We realize that as a practical matter the department chairman frequently follows the tenured faculty's recommendations concerning

tenure. There may be instances in which impermissible factors motivate an advisory body's recommendation. In such instances, the designation of "advisory" would not necessarily insulate the official decision if it can be shown that the committee's conduct was a factor motivating the official decision.