**Deborah L. AVERY, et al., Plaintiffs,**

**v.**

**Robert JENNINGS, et al., Defendants.**

**No. C–1–83–0099.**

United States District Court,
S.D. Ohio, W.D.

Jan. 16, 1985.

Robert Newman, Cincinnati, Ohio, for plaintiffs.

James W. Harper, John A. Lloyd, Jr., Cincinnati, Ohio, for defendants.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

CARL B. RUBIN, Chief Judge.

This case is before the Court on cross motions for summary judgment (docs. 10 and 11), which present the Court with a difficult and novel question: Do the Defendants' hiring practices impermissibly infringe upon the first and fourteenth amendment rights of the Plaintiff, who sought, but was not considered for, positions in which her political affiliation would not affect her job performance? Both parties have filed memoranda in opposition to the adverse motions (docs. 15 and 19), and plaintiff has filed a reply memorandum in support of her motions (doc. 20). The cross motions are therefore ripe for decision. S.D.Ohio R. 4.0.2.

### I. Findings of Fact

(1) The plaintiff, Deborah Louise Avery, applied for a position in the defendants' offices on December 21, 1982 by filing an application for employment with the Hamilton County Employee Services Office, in the Hamilton County Courthouse, Cincinnati, Ohio. That same day, plaintiff unsuccessfully attempted to introduce herself to each of the three defendants, Robert Jennings, Clerk of the Court of Common Pleas, John E. Held, County Recorder, and Joseph DeCourcy, Jr., County Auditor.[1]

(2) A day or two later, plaintiff contacted Republican Party Headquarters to learn the name of the Republican Party Ward

---

1. The Court will take judicial notice of the fact that the three defendants are Republicans. *See,* Fed.R.Evid. 201.

Chairman for her area. She was given the name of Hank Zureick, a bailiff at the Hamilton County Courthouse. Plaintiff telephoned Mr. Zureick, who asked her whether she was a Democrat or Republican, then told her it would not mean anything when she replied "Democrat." Mr. Zureick informed the plaintiff that he was not the ward chairman for her area, and he referred her to Mr. James Gibson, Director of the Hamilton County Department of Employee Services. Although Mr. Zureick and other ward chairmen sometimes recommend persons for employment in the defendants' offices, they have no hiring authority.

(3) Plaintiff contacted Mr. Gibson on December 23, 1982. He told her there were no job vacancies at that time.

(4) On December 29, 1982, plaintiff sent letters to all three defendants in which she introduced herself as a laid-off steelworker who had applied for a job through the personnel office. The letter requested an interview and accompanied a resume showing that plaintiff had actually been a clerical worker at a foundry, that she had both clerical and secretarial experience, and that she had an associate's degree in secretarial studies. Plaintiff did not receive a reply from any of the defendants' offices.

(5) Plaintiff called Mr. Zureick again on January 14, 1983 and told him that she was thinking of becoming a Republican. Mr. Zureick referred her to the ward chairman for her area, Tom Puckett. When plaintiff called Mr. Puckett, she spoke only to Mrs. Puckett, who asked her if she was looking for a job and warned her that there were no vacancies. Plaintiff did not talk to Tom Puckett.

(6) Plaintiff placed a third telephone call to Mr. Zureick, who denied that plaintiff would have to be a Republican to get a job at the courthouse, but said that when jobs did open up, "maybe a fellow Republican could help [her] out with a job" if she were affiliated "in some way" with the Republican Party. (Avery deposition at 39–40).

(7) Four days later, on January 18, 1983, the plaintiff filed suit against the three defendants, claiming that her political be-liefs had disqualified her from consideration for employment in their offices.

(8) Plaintiff first registered to vote in 1976 and voted in the general elections in 1976 and 1977. As a result of her failure to vote in any general election after 1977, plaintiff's name was removed from the list of registered voters on August 8, 1980. Plaintiff re-registered to vote on December 21, 1982. As of August of 1983, plaintiff had never registered to vote in a Democratic primary, but plaintiff considers herself a Democrat.

(9) Four weeks elapsed between the time plaintiff filed her application for employment and the time she filed suit against the defendants. During that time period there were no job vacancies for clerical or secretarial positions in any of the three defendants' offices, or in any other office in the Hamilton County Courthouse. Between the date the suit was filed in January of 1983 and the end of September of 1983, vacancies in all three defendants' offices were filled, without considering applications on file with the Employee Services Office.

(10) Defendant Held has been the Hamilton County Recorder since 1974. His office employs approximately thirty to thirty-six people. No vacancies ever occur, as such, but when the work load gets too heavy, a new person is hired. Such a position would not be publicly advertised, nor would the Hamilton County Employee Services Office be contacted for applications. Positions are filled with persons who have been personally recommended to defendant Held by people he knows, other employees, ward chairmen of both political parties, judges, and the heads of other departments in the courthouse. Prospective employees are interviewed by Mr. Held or his Chief Deputy, and the final hiring decision is always made by Mr. Held. A person applying for a job in Mr. Held's office is not asked her political preference, and a person who volunteered that she was a Democrat would not thereby be excluded from employment. Mr. Held's office has employed Democrats.

(11) Defendant Jennings has been the Clerk of Courts since 1961, when he was appointed to fill an unexpired term. He has since been elected six times. Job vacancies in Mr. Jennings' office are filled both through personal recommendations and through the Hamilton County Employee Services Office. Republican Party Headquarters does not refer prospective employees or send cards signed by Republican ward chairmen. Job openings are not advertised publicly. An applicant meets with both Mr. Jennings and Bob Rudig, the Administrator of the Office. Neither man asks the applicant her political preference. Mr. Jennings prefers to hire Republicans, because he wants employees who are loyal to him, and he assumes that most people who refer applicants to him refer Republican applicants. Once employed, employees are not required to contribute to the Republican Party or to work for the re-election of Mr. Jennings or other Republican office holders. Mr. Jennings' office has employed Democrats.

(12) Defendant Decourcy has been the County Auditor since 1971. When a vacancy occurs in the auditor's office, Mr. DeCourcy tries to fill it by promoting a present employee. If that is not possible, and if the job is a non-technical one, he consults with his employees to determine whether they know of anyone they could recommend. If that course fails, Mr. DeCourcy tells the supervisor of the department with the job opening to call the Employee Services Office to send people over to interview. Although the ultimate hiring decision is made by Mr. DeCourcy, the supervisor does the interviewing and evaluating of prospective employees. When an applicant has been informally referred to the auditor's office, Mr. DeCourcy will meet with the person first. When an applicant has been referred by the Employee Services Office, the supervisor of the department conducts the initial interview. Republican Party Headquarters plays no role in suggesting or recommending people for employment in the auditor's office, nor does it send employment cards signed by ward chairmen. No one in the Auditor's office checks the voting record of prospective employees. Mr. DeCourcy would prefer to have Republicans working for him because he assumes Republican employees would be more interested in helping him get re-elected. Although people who refer job applicants may mention the prospective employee's political affiliation, Mr. DeCourcy and his supervisors do not discuss political activity or political loyalty of job applicants. Once employed, employees are not encouraged to contribute to the Republican Party. Mr. DeCourcy's office has employed Democrats.

(13) All three defendants employ persons with qualifications similar to the plaintiff's to fill a number of clerical and secretarial positions. Defendant Held was in Florida when plaintiff's letter to him arrived in his office, and he did not see it until after plaintiff filed this suit. Defendant Jennings never received plaintiff's letter, although he did see the copy attached to the complaint. Defendant DeCourcy recalled talking to the plaintiff and telling her to apply through the Employee Services Office, but he never saw the letter that plaintiff sent to his office. Mr. Held could not tell without talking to the plaintiff whether she would be qualified to work in his office. Mr. Jennings thought plaintiff's resume indicated that she was qualified to do a number of jobs in his office, but that she would not be considered because she had filed suit against him. Similarly, Mr. DeCourcy stated that he would not consider hiring the plaintiff because she had filed suit and was antagonistic towards his office.

(14) According to James Gibson, the county's Board of Commissioners laid off fourteen employees, four of them clerical workers, in the month in which plaintiff filed her application. There were no job vacancies at that time, and the laid-off employees would have been considered first for any openings that might have occurred in any county office.

## II. *Opinion*

The first question which the Court must decide on a motion for summary judgment is whether the pleadings, depositions, an-

swers to interrogatories, admissions, and affidavits on file with the Court reveal any genuine issue as to any material fact. Fed. R.Civ.P. 56(c). If any such issue is found, the motion must be denied, for the Court deciding a Rule 56 motion cannot try issues of fact but may merely determine whether they exist. *In re Atlas Concrete Pipe, Inc.*, 668 F.2d 905, 908 (6th Cir.1982). In the instant case, the parties agree that there are no factual disputes remaining and that summary judgment is appropriate.

A few of the factual allegations in plaintiff's complaint have been disproved through the discovery process; for example, the complaint alleges that plaintiff's ward chairman asked her whether she was a Democrat or a Republican, but plaintiff's own deposition indicates that she never spoke to the ward chairman for her area. Similarly, the complaint states that applicants for employment in county offices must be recommended by the appropriate party precinct executive and approved by the appropriate ward chairman, through use of a card indicating political preference. All three defendants stated that they did not accept the cards from prospective employees and that the cards were not considered in the hiring process.

There are a few other examples of conclusory factual allegations that were made in the complaint but disproved through the depositions of the plaintiff and the defendants. Plaintiff has produced no evidence to support these allegations in the complaint, so the apparent factual conflict between the complaint and the other facts on file will not require the Court to find that any *genuine* issues of material fact still remain to be tried. Rule 56 requires that the party opposing a motion for summary judgment set forth "specific facts showing that there is a genuine issue for trial." Summary judgment is still possible where the plaintiff's conclusory allegations in his complaint and affidavit are insufficient to rebut the evidence offered by the defendants. *Patmon v. Van Dorn Co.*, 498 F.2d 544, 547 (6th Cir.1974); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (party opposing the motion "must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful.") And, although summary judgment is often inappropriate where issues of intent and motive are involved, as they are in this case, summary judgment should be granted if there are no issues of fact left to be determined. *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 69 (6th Cir.1982) (affirming grant of summary judgment for defendant in age discrimination suit).

Neither party has pointed out, nor can the Court find, any genuine issue of material fact remaining to be tried in this case. Summary judgment is therefore appropriate, and the Court must decide which of the moving parties is entitled to judgment as a matter of law.

The plaintiff's cause of action is premised upon the basic principle that the government may not deny a person a valuable benefit, such as employment, on a basis that infringes her constitutionally protected interest in freedom of speech. *See Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1971); *Keyishian v. Board of Regents*, 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967).

A public employee's first amendment rights are not unlimited, however. In *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), the Supreme Court recognized that the state, as an employer, had an interest in regulating the speech of its employees, and that it was necessary to balance the interest of the state in promoting efficient public service against the interest of the employee in commenting upon matters of public concern. In that case, a teacher was impermissibly discharged for writing and publishing a letter critical of his employer; although the letter contained misstatements, no showing was made that the employee knowingly or recklessly made the false statements. *Id.* at 574, 88 S.Ct. at 1737.

Statements made in private are entitled to no less protection under the first amendment, according to *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979). In *Givhan*, the employee's criticism of the school's practices were directed to the principal, in his office. The Court held that this private expression deserved the same balancing of interests as that afforded the public expression in *Pickering;* the Court also noted, however, that the elements to be weighed in the balance might be different. *Id.* at 415 n. 4, 99 S.Ct. at 696 n. 4. Those factors—manner, time, and place of the expression—were considered in the balance of interests in *Connick v. Myers*, 461 U.S. 138, 153, 103 S.Ct. 1684, 1693, 75 L.Ed.2d 708 (1983). First, the Court found that most of the questionnaire, the distribution of which precipitated the employee's dismissal from public employment, was not directed to matters of public concern; only the one question that was on a matter of public concern entitled the employee to scrutiny of her discharge by a federal court. *Id.* at 146–47, 103 S.Ct. at 1689–90. The Court weighed the nature of the expression, the impediment the expression caused in the employee's ability to perform her responsibilities, the disruption of the public office, the place in which the questionnaire was distributed, and the context in which the expression took place. In light of all these elements, the Court characterized the questionnaire as an employee grievance over office policy, which was entitled to very limited first amendment protection. Weighing that minimal protection against the effects of the questionnaire, which were to undermine office relationships, erode the employer's authority, and disrupt the office, the Court held that the employee's discharge did not offend the first amendment. *Id.* at 154, 103 S.Ct. at 1693.

A balancing test similar to that articulated in *Pickering* was employed by the Supreme Court in its first of two opinions invalidating discharges of public employees on the basis of their political beliefs or affiliation. In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a fragmented Court struck down the practice of the Sheriff of Cook County, Illinois, of replacing non-civil-service employees in his office with members of his own political party, if the existing employees were not members of, or supported by a leader of, the newly-elected Sheriff's own party. Justice Brennan wrote the plurality opinion, which held that patronage dismissals were inconsistent with the first amendment, as they indirectly deny a person his constitutionally-protected rights of free speech and association. *Id.* at 358–59, 96 S.Ct. at 2682–83. Recognizing that the prohibition against encroachment of first amendment protections is not absolute, however, Justice Brennan examined the interests offered as justifications for continuation of the patronage dismissal practices at issue in *Elrod*, weighed them against the infringement upon first amendment rights posed by the dismissals, and concluded that the only valid justification offered was the need to insure that the policies approved by the electorate are effectively implemented, thus the only permissible patronage dismissals were those in policymaking positions. *Id.* at 372, 96 S.Ct. at 2689. Justices Stewart and Blackmun, whose votes were necessary to the plurality decision, contributed an extremely short opinion concurring in the judgment, but declining to join the plurality's blanket condemnation of the patronage system. In particular, Justice Stewart refused to offer any views on the "constitutional validity of a system that confines the *hiring* of some governmental employees to those of a particular political party." *Id.* at 374, 96 S.Ct. 2690 (emphasis added).

In the second of the two patronage cases, *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court refused to limit *Elrod* to cases in which employees are threatened with discharge unless they change their political allegiance, holding instead that the employees need only prove that they were discharged "solely for the reason that they were not affiliated with or sponsored by" the employer's political party. 445 U.S. at 516–17,

100 S.Ct. at 1293–94. Indeed, rather than limiting the holding of *Elrod*, the Court limited the exception expressed in *Elrod* allowing consideration of party affiliation where the position involved policymaking. After *Branti*, the only exception to the ban on patronage dismissals applies to positions in which party affiliation is an "appropriate requirement for the effective performance of the public office." *Id.* at 518, 100 S.Ct. at 1294. As the positions involved in that case were as assistant public defenders, the Court held the discharges violative of the first amendment. *Id.* at 519–20, 100 S.Ct. at 1295–96.

■ Together, the *Elrod* and *Branti* cases represent a very narrow subclass of the cases involving discharge from public employment as a result of the exercise of first amendment rights. Where the discharge of a public employee is based solely on her political affiliation, the Supreme Court has already performed the required balancing of interests and determined that the only governmental interest sufficient to justify such a discharge is the need to insure that the will of the electorate is carried out. Therefore, unless party affiliation affects the discharged employee's ability to effectively perform her job, a politically-motivated discharge represents an impermissible infringement on the employee's first amendment rights. No decided case, however, has extended the rationale of these two cases to a situation involving an employment decision other than a discharge, although one circuit has held that *Elrod* and *Branti* may apply to invalidate a transfer and reassignment that was the "substantial equivalent of dismissal." *Delong v. United States*, 621 F.2d 618, 624 (4th Cir.1980). Furthermore, recent Supreme Court treatment of *Elrod* and *Branti* evidences no desire to extend the application of those cases beyond their particular facts. *E.g., Connick*, 461 U.S. at 149, 103 S.Ct. at 1691 (citing only for the proposition that employees may not be coerced into working for political candidates); *Minnesota State Board v. Knight*, 465 U.S. 271, ——, ——, 104 S.Ct. 1058, 1067, 1078, 79 L.Ed.2d 299 (1984) (citing Justice Powell's dissent in *Branti*).

■ To recognize the plaintiff's claim that the defendants' failure to hire her, allegedly on the basis of her political affiliation, was an encroachment on her first amendment rights under the line of cases discussed above would require, therefore, a broad and unwarranted extension of those cases beyond their facts and precedential effect. The facts of the instant case simply do not bring it within this particular subclass of cases.[2] Absent any persuasive arguments in favor of extending the applicability of *Elrod* and *Branti* to cases involving employment decisions other than discharges, this Court declines to do so. The plaintiff's case will, therefore, be decided under broader precepts of first amendment rights of public employees.

In pleading her case, plaintiff has focused on the general principle of *Keyishian* and *Perry* and the specific application of *Elrod* and *Branti*. Little focus has been put upon the limitations and the balancing reflected in *Pickering, Givhan*, and *Connick*. More importantly, however, the plaintiff has ignored another principle that must be factored into any examination of the interplay between a public employee's first amendment rights and a public employer's interest in maintaining an effective work force: "The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct." *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (unanimous decision).

In the *Mt. Healthy* case, a nontenured teacher's contract was not renewed following several instances of conduct, at least one of which was protected under the first amendment. The teacher brought suit, and the district court found that since his protected activity played a substantial part in the decision not to renew his contract, his constitutional rights had been violated.

---

**2.** There is no dispute, however, that the positions for which plaintiff applied were *not* positions in which political affiliation is an appropriate job qualification.

The Supreme Court found that the district court's analysis stopped one step short of completion: After the discharged employee shows that his conduct was constitutionally protected and that the conduct was a substantial factor in the decision not to rehire him, the burden of proof shifts to the defendant to show that it would have reached the same decision in the absence of the protected conduct. *Id.* at 287, 97 S.Ct. at 576. As the lower courts had not applied the entire test, the Supreme Court vacated their judgments and remanded the case.

The three steps in the *Mt. Healthy* analysis were laid out and described in some detail in *Reichert v. Draud*, 701 F.2d 1168, 1170 (6th Cir.1983), *citing Hildebrand v. Board of Trustees*, 662 F.2d 439, 442–43 (6th Cir.1981), *cert. denied*, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982):

> (1) The threshold question is whether the plaintiff's conduct deserves constitutional protection.
>
> (2) If the court finds that an employee's conduct was protected by the first amendment, the finder of fact must determine whether [the action taken was] because he engaged in the protected conduct. The employee's protected conduct must be a "substantial factor" or a "motivating factor" in the employer's decision.
>
> (3) Once the employee meets this burden [as outlined in 2 above] the burden is on the employer to prove that the action the employee is complaining about would have taken place absent the protected conduct. (citations omitted).

In *Hildebrand*, a teacher at a state university was denied tenure after he had criticized the curriculum and run for a position on an advisory committee at the university. The Sixth Circuit assumed, without deciding, that the faculty member's activities were protected by the first amendment, but held that the evidence produced by the university clearly showed that the faculty member's denial of tenure was not based upon his exercise of rights. *Id.* at 444. The Court reached a similar conclusion in *Reichert*, where a teacher claimed that schedule changes were the result of her protected activities as president of the

teachers' association. Again, the Court made no specific finding as to the protected status of the conduct involved, but held that the plaintiff had failed to show that the conduct played a substantial part in the decision to change her schedule. 701 F.2d at 1171. Applying the three-part test of *Mt. Healthy* to the plaintiff's case leads this Court to the same conclusion reached by the Sixth Circuit in both *Reichert* and *Hildebrand*.

■ (1) *Conduct.* The right to associate with the political party of one's choice is an activity protected by the first and fourteenth amendments. *Kusper v. Pontikes*, 414 U.S. 51, 56–67, 94 S.Ct. 303, 307–13, 38 L.Ed.2d 260 (1973). In light of the particular facts of this case, however, defendants argue that there have been no protected activities by the plaintiff. Although plaintiff claims to be a registered Democrat, she has never actually registered to vote in a primary, nor, in fact, had she voted in the general elections in the years immediately preceding the filing of this suit. However, the plaintiff now alleges that she is a Democrat, and that she wishes to remain a Democrat, even if employed by the defendants; although the defendants question the strength of plaintiff's political commitment, they offer no evidence to refute her claims of allegiance. The Court will assume, therefore, that plaintiff has met her burden of proof as to the first prong of the test.

■ (2) *Substantial Factor.* The second prong of the test requires the plaintiff to prove that her protected conduct was a "substantial" or "motivating" factor in the defendants' failure to hire her. "That burden is not insignificant. A disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election." *Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed. 139 (1982). Mere proof that some protected conduct took place is not sufficient to meet the burden

obviously, for in both *Reichert* and *Hilde-brand* the plaintiffs had engaged in activities that were arguably related to their first amendment rights to associate freely and express their opinions on matters of public concern. At the very least, it seems apparent that the plaintiff must prove that the decision-makers *knew* of the protected activity. The predicate requirement of knowledge has been recognized by the Third Circuit. In *Laskaris v. Thornburgh*, 733 F.2d 260 (3d Cir.1984), a discharged public employee presented evidence that his replacement was a Republican, as were the defendants in the case. Without sufficient evidence that any of the defendants even knew that plaintiff was a Democrat, the fact of the replacement's political affiliation would not in itself support an inference that the plaintiff's discharge was politically motivated. The court held, therefore, that the plaintiff had failed to establish that his political affiliation was a substantial or motivating factor behind his discharge. *Id.* at 265–66.

Plaintiff concedes that none of the defendants asked if she was a Republican or a Democrat, that no one in any of their offices so inquired, and that she did not volunteer that information to them. The only person who posed that question to plaintiff was a ward chairman for a ward other than plaintiff's, but that gentleman plays no part in the hiring practices of the defendants' offices, other than to occasionally recommend persons for employment, as do other of the defendants' friends and co-workers. Even if the defendants had tried to learn of plaintiff's political associations through public records, they would have found only that plaintiff had never registered to vote in a Democratic primary election. Plaintiff has produced absolutely no evidence that any defendant knew of her political affiliation during the time period between the filing of her job application and the filing of this lawsuit. Therefore, the Court holds that the plaintiff has not met her burden of proof on the second prong of the *Mt. Healthy* analysis; there is

no evidence on this record that plaintiff's conduct, her political affiliation with the Democratic Party, was a substantial factor in plaintiff's failure to obtain employment in any of the defendants' offices.

 (3) *Showing by Defendants.* Even if plaintiff had met the burden required of her under *Mt. Healthy*, the Court holds that the defendants have shown by a preponderance of the evidence that their failure to hire plaintiff would have occurred even absent her protected conduct. Clerical workers were actually laid-off in the month in which plaintiff filed her application; these people would have been given the first opportunity to fill any vacancies that might have occurred. However, there were no vacancies during the relevant time period. In addition, none of the defendants even saw the letters sent to them by plaintiff until after she had filed her lawsuit, so none of these potential employers had been given any opportunity to consider plaintiff for employment in their offices. The failure to hire plaintiff was a result of the lack of vacancies and the lack of opportunity to consider her for employment. On the facts of this case, plaintiff's political affiliation actually played no part in her failure to find employment with the defendants.

Although plaintiff's complaint alleges violations of the fourteenth amendment as well as the first, no separate equal protection argument was made in any of plaintiff's pleadings. For the same reasons that the Court finds no violation of the plaintiff's first amendment rights, we would also find no violation of the plaintiff's fourteenth amendment rights. Plaintiff has not produced any evidence that she has been treated differently as a result of her association with the Democratic Party.

### III. Conclusions of Law

 (A) Jurisdiction over this suit brought under 42 U.S.C. § 1983 is conferred upon this Court by 28 U.S.C. § 1343(3) and (4).

(B) *Elrod* and *Branti* represent a very narrow subcategory of cases involving first amendment rights in the public employment area; these cases are applied only where a public employee has been discharged solely because of his or her political affiliation. No cause of action has yet been recognized under these two cases for a failure to hire because of political affiliation.[3]

(C) Plaintiff failed to establish that her political affiliation was a substantial factor behind her inability to obtain employment with the defendants; she therefore failed to meet her burden of proof under the *Mt. Healthy* case. Even if she had met this burden, and the burden of proof had then shifted to the defendants, the defendants produced uncontroverted evidence sufficient to meet their heavy burden of showing that plaintiff's inability to obtain employment would have remained the same in the absence of the protected conduct. Plaintiff has failed, therefore, to establish any infringement upon her first or fourteenth amendment rights.

(D) In accordance with conclusions (A), (B), and (C) above, the plaintiff's motion for summary judgment is denied, and the defendants' is granted.

IT IS SO ORDERED.

---

**3.** Plaintiff brought her suit as a class action, and the motion to certify the class is pending at this time. However, as the Court holds that this plaintiff has failed to establish any infringement on her first amendment rights and that no court has ever recognized the cause of action asserted on behalf of the class, the class allegations in the complaint and the unresolved motion to certify the class present no impediment to this Court's deciding this case on its merits. *Marx v. Centran Corp.,* 747 F.2d 1536, 1552 (6th Cir. 1984) ("It has never been doubted that a complaint asserting a class action could be dismissed on the merits before determining whether the suit could be maintained as a class action.").