831 F.2d 293
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James A. BAXTER, Plaintiff-Appellee,
v.
STATE OF TENNESSEE DEPARTMENT OF CORRECTIONS, Defendant,
Ernest Pellegrin; Ronald Bishop; and Michael Slaughter,
Defendants-Appellants.
 No. 86-6201
 United States Court of Appeals, Sixth Circuit.
 October 6, 1987.
 
 Before RALPH B. GUY, Jr. and BOGGS, Circuit Judges, and SUHRHEINRICH, District Judge.*
 PER CURIAM.
 
 
 1
 Defendants appeal from the jury verdict awarding damages to plaintiff based on the finding that defendants had violated his right to free speech as guaranteed by both the First Amendment to the United States Constitution and the Tennessee Constitution. For the following reasons, the judgment against the defendants is affirmed.
 
 I.
 
 2
 Plaintiff, James A. Baxter, filed this action on May 1, 1985, in federal court alleging violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. Sec. 2000(e), et seq. and 42 U.S.C. Secs. 1981, 1983 and 1985, based on his dismissal from employment with the Tennessee Department of Corrections. Plaintiff alleged that his discharge was racially motivated and in retaliation for the exercise of his right to free speech as guaranteed by the First and Fourteenth Amendments to the United States Constitution and by Article I, Sec. 19 of the Constitution of Tennessee. A jury trial was held in August of 1986. With respect to plaintiff's claims of racial discrimination, the jury found in favor of the defendants. Three of the defendants, however, were found to have violated plaintiff's rights to free speech. As a result, the plaintiff was awarded $42,500 in compensatory damages and $16,000 in punitive damages. Both parties subsequently filed motions for judgment notwithstanding the verdict. On October 10, 1986, the district court entered an order denying both defendants' and plaintiff's motions. Defendants appeal from the jury's award of damages to the plaintiff.
 
 
 3
 Plaintiff, a black male, was employed by the Tennessee Department of Corrections from October 21, 1978, through July 16, 1984. Plaintiff taught classes to juvenile offenders who were incarcerated at the Spencer Youth Center which was administered by the Tennessee Department of Corrections. In the spring of 1984, plaintiff helped organize the Tennessee State Black Employees Coalition (Coalition) in order to investigate allegations of racial discrimination supposedly occurring within the Spencer Youth Center. On March 2, 1984, plaintiff wrote a letter, as president of the Coalition, to Ernest Pellegrin, Commissioner of the Department of Correction, describing unfair treatment of black students at the Spencer Youth Center and accusing the administration of discriminating against blacks when making employment decisions. Commissioner Pellegrin ordered internal investigations to be conducted in response to the letter, however, these studies apparently concluded that the administrators of the Spencer Youth Center had not acted in a discriminatory manner.
 
 
 4
 Unsatisfied with the results of the investigations, plaintiff appeared on a local radio talk show on June 3, 1984, in order to discuss some of the problems at the Spencer Youth Center. For over a year the local media had focused its attention on reports of problems at the Spencer facility. Plaintiff discussed the overcrowding and the disciplinary problems which had resulted from the recent integration of female students into the formerly all-male institution. In addition, plaintiff spoke at length regarding what he perceived to be racially discriminatory practices directed at both staff and students of Spencer. At one point, plaintiff compared Assistant Commissioner Paul Humphries to Adolph Hitler and stated that Humphries had a 'hit list,' and had 'set people up to fail' in order to eliminate blacks from employment at Spencer. Plaintiff further stated that defendant J. Michael Slaughter had a reputation of 'slaughtering' people and had been assigned to the Spencer facility in order to eliminate black employees.[1]
 
 
 5
 A few days after the radio talk show, Mr. Slaughter issued a directive ordering plaintiff to leave the Spencer campus immediately after class each day. On June 25, 1984, Deputy Commissioner Ron Bishop sent a letter to plaintiff ordering him to verify the allegations he had made in the radio program. Plaintiff declined to respond to the letter and instead referred the matter to a co-worker who acted as a public relations director for the Coalition. After the plaintiff failed to respond personally to the letter, Mr. Bishop attempted to contact plaintiff by telephone on Monday, July 9, 1984. Plaintiff was unavailable when Bishop called and plaintiff's subsequent attempts to return Bishop's call were unsuccessful. Bishop tried to call the plaintiff again on July 10 and on July 11, but plaintiff was unwilling to leave his classroom unattended and therefore did not receive the calls.
 
 
 6
 On the afternoon of July 11, 1984, plaintiff was summoned to Mr. Bishop's office and was given a letter of termination. The letter detailed the plaintiff's failure to respond to the June 25 letter and to the phone calls made on July 9, 10, and the morning of July 11. The letter also stated:
 
 
 7
 On June 3, 1984, on a public radio broadcast you made serious charges against Spencer Youth Center and various Department of Corrections officials. You failed to comply with my requests to substantiate these allegations as per my June 25, 1984, letter. Such unfounded allegations is [sic] considered conduct unbecoming to a State employee. On Tuesday, July 10, you again failed to comply with my directive. Today, Wednesday, July 11, you refused to comply with my directive to contact me. This is insubordination.
 
 
 8
 Because of the serious nature of your charges and the effect this has upon the morale and operation of the institution and the department, it is, therefore, my intent, based on the information I have to remove you from your position as a teacher at the Spencer Youth Center.
 
 
 9
 App. 281-82. In lieu of dismissal, plaintiff was offered a voluntary demotion to the position of corrections officer at a substantially lower salary. Plaintiff was also advised of his rights to a hearing. Plaintiff chose not to accept the demotion and as a result he was terminated from employment.
 
 II.
 
 10
 Essentially, the defendants Bishop, Slaughter and Pellegrin raise four arguments on appeal. First, defendants contend that the issue of whether plaintiff's speech was constitutionally protected was improperly submitted to the jury and should have been decided by the trial judge as a matter of law. Moreover, defendants argue that the instructions submitted to the jury on this issue were erroneous. Second, defendants claim that plaintiff was dismissed for insubordination and that the jury erred in its findings that the defendants' actions were taken in retaliation for the plaintiff's exercise of his right to free speech. The third and fourth arguments which are combined in the defendants' brief on appeal amount to assertions that the damage award was excessive and that the trial court lacked jurisdiction over the Tennessee constitutional claims. We address each of these issues separately.
 
 
 11
 With respect to the defendants' allegations of error concerning the form and contents of the jury instructions, we note that the defendants did not raise any objections to the jury instructions during the course of the trial below. Rule 51 of the Federal Rules of Civil Procedure states in part, 'No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict . . ..' Accordingly, we cannot overturn the jury verdict on appeal unless we find that the instructions amounted to 'plain error.' See Morrison v. New York Cent. R. Co., 361 F.2d 319, 320 (6th Cir. 1966).
 
 
 12
 The question of whether or not plaintiff's speech was constitutionally protected was a question of law for the district court. See Hildebrand v. Board of Trustee, Michigan State University, 662 F.2d 439 (6th Cir. 1981), cert. denied, 102 U.S. 1760 (1982). This court has held that in cases where the district court has improperly submitted this issue to the jury, the court has committed 'plain error.' See, e.g., Stern v. Shouldice, 706 F.2d 742, 748 (6th Cir. 1983) (citing Schneider v. City of Atlanta, 628 F.2d 915 (5th Cir. 1980)). Nevertheless, a jury verdict in favor of the plaintiff may be upheld if the appellate court concludes, as a matter of law, that plaintiff's claims were entitled to constitutional protection. See Stern, 706 F.2d at 748. We thus turn to this task.
 
 
 13
 The United States Supreme Court has recently reiterated the balancing test which is to be used when determining whether a public employee's speech deserves constitutional protection. See Rankin v. McPherson, 55 U.S.L.W. 5019 (June 24, 1987). As a threshold issue, the court must first determine whether the plaintiff's speech may be 'fairly characterized as constituting speech on a matter of public concern.' Id. at 5021 (quoting Connick v. Meyers, 461 U.S. 138, 140 (1983)). In the instant case, we find that the remarks made by the plaintiff during the course of the radio broadcast on June 3, 1984, clearly implicated matters of public concern. First, with respect to plaintiff's allegations of racial discrimination at the Spencer Youth Center, such speech has been held to be of inherent public concern. See Connick, 461 U.S. at 148 n.8. The plaintiff also commented at length in regards to the disciplinary problems and the overcrowding which had resulted from the introduction of large numbers of female students into the institution. These issues had been the subject of numerous media reports in the past, and the defendants apparently concede that these specific problems were a matter of public concern. Moreover, plaintiff appeared on the program in his capacity as spokesperson for an organized group of public employees who were concerned with alleged problems of racism within the state government. Therefore, his remarks should not be taken as merely being the personal complaints of a disgruntled individual employee. Nor should the sarcastic remarks directed at Humphries and Slaughter be viewed in isolation from the rest of plaintiff's comments. Rather, we must consider the 'content, form and context of a given statement, as revealed by the whole record.' Id. at 147-48 (emphasis added).
 
 
 14
 Having concluded that the plaintiff's remarks implicated a matter of public concern, the next step is to balance the plaintiff's interests in making the statement against 'the interest of the state, as an employer, in promoting the efficiency of the public service it performs through its employees.' Pickering v. Board of Education, 391 U.S. 593 (1968). Defendants contend that plaintiff's 'false allegations' made during the course of the radio broadcast demonstrated that he lacked the character traits necessary to perform his job as a teacher in a correctional institution; and therefore, the state was justified in dismissing him. The defendants also allege that the plaintiff's behavior diminished his influence as a role model among the students, and thereby impaired his effectiveness as a teacher. We find these arguments without merit.
 
 
 15
 First, the testimony presented at trial indicates that none of the students at Spencer heard the broadcast, and hence, it is unlikely that plaintiff's remarks had any effect on their perception of the plaintiff as a teacher or role model. Second, defendants fail to allege any specific examples of disruption or problems within the staff which were directly attributable to plaintiff's appearance on the radio program. Finally, there is nothing in the record which would support the defendants' assertion that the plaintiff knowingly or recklessly made false statements during the course of the broadcast. Most of the plaintiff's factual statements regarding the conditions at Spencer were verified by independent investigations and the defendants apparently concede this point. Instead, defendants focus on the plaintiff's allegations of racism and his derogatory remarks directed at Mr. Humphries and Mr. Slaughter. We find that the plaintiff's comments were not recklessly or knowingly false in light of evidence submitted at trial involving several racial incidents which allegedly occurred at Spencer. Moreover, plaintiff's comparison between Mr. Humphries and Adolph Hitler and his comment that Mr. Slaughter had a reputation for 'slaughtering people' should be recognized as mere hyperbole and not as a statement of fact. The Supreme Court has noted that, '[d]ebate on public issues should be uninhibited, robust, and wide open and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). Although the plaintiff's superiors may have taken umbrage at plaintiff's remarks, defendants have failed to demonstrate that the plaintiff's speech diminished his effectiveness as a teacher or had an unduly adverse impact on the performance of the rest of the staff at the Spencer Youth Center. Therefore, we find that the plaintiff's right to comment on matters of public concern regarding conditions at a state institution outweighed the state's interest as an employer in disciplining an employee for making such remarks. Thus, the plaintiff's statements fall within the protection of the Constitution.
 
 III.
 
 16
 The second major issue raised by the defendants focuses on the causation aspect of plaintiff's claim. In Mount Healthy City Board of Education v. Doyle, 429 U.S. 274 (1976), the Supreme Court held that the plaintiff has the burden of proving that his speech was a 'substantial' or 'motivating' factor in the employer's decision to terminate his employment. Id. at 287. The burden then shifts to the employer who must be given an opportunity to prove that the plaintiff would have been fired even if he had not engaged in the protected conduct. Id. Defendants argue that plaintiff was not discharged in retaliation for his appearance on the radio program, but rather, he was dismissed for insubordination based on his failure to respond to the summons of his superior. Furthermore, defendants contend that even if the plaintiff's dismissal was motivated in part by his public comments, the subsequent acts of insubordination constituted separate and adequate grounds for dismissal.
 
 
 17
 The matter of causation is an issue of fact which must be decided by the jury. See Hildebrand v. Board of Trustees, 662 F.2d 439, 443 (6th Cir. 1981) cert. denied, 456 U.S. 910 (1982). In the instant case, the jury was properly instructed on the shifting burdens of proof, and it resolved the causation issue in favor of the plaintiff. The defendants filed a motion for judgment notwithstanding the verdict which was denied by the district court. The issue raised by the motion for a judgment notwithstanding the verdict is whether there is sufficient evidence to raise a question of fact for the jury. In determining whether the evidence is sufficient, the trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury. Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor. If, after thus viewing the evidence, the trial court is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted. An appellate court when reviewing the trial court's decision is bound by the same standard. Morelock v. NCR Corp., 586 F.2d 1096, 1104-05 (6th Cir. 1978), cert. denied, 441 U.S. 906 (1979).
 
 
 18
 We note that this court has recently upheld a jury's finding that the defendant school board had improperly refused to renew a principal's employment contract in retaliation for his public criticism of the school board. See Ratliff v. Wellington Board of Education, No. 86-3204 (6th Cir. June 10, 1987). In Ratliff, the evidence presented by plaintiff on the causation issue was subjective and circumstantial. In contrast, several of the defendant board members expressly testified that Ratliff's speech played no part in the decision not to renew his contract. Nevertheless, we held that the circumstantial evidence was sufficient to permit a reasonable inference that Ratliff was not rehired in retaliation for making the speech. Id. slip op. at 6.
 
 
 19
 In the case at bar, the evidence of causation is much more compelling than that which was found to be sufficient in Ratliff. The letter of dismissal did not cite any reasons for the plaintiff's discharge other than his appearance on the radio talk show and his subsequent failure to return the calls of his superior. Moreover, the alleged acts of insubordination were directly related to the protected activity since Mr. Bishop was attempting to contact the plaintiff in order to discuss the radio broadcast. Thus, we find ample evidence in the record from which the jury could reasonably conclude that plaintiff's public criticism of his superiors was a substantial motivating factor in his dismissal and that he would not have been dismissed if he had not made such comments during the course of the radio interview.
 
 IV.
 
 20
 Defendants further claim on appeal that the damages awarded by the jury were excessive and therefore should be reversed. The jury awarded the plaintiff $42,500 in compensatory damages and an additional $16,000 in punitive damages. As with the other issues raised in this appeal, our scope of review is extremely limited. A damage award cannot be overturned unless it is so disproportionately large as to 'shock the judicial conscience.' Thompson v. National Railroad Passenger Corp., 621 F.2d 814, 827 (6th Cir.) cert. denied, 449 U.S. 1035 (1980). In the instant case, the parties stipulated that plaintiff's net wage loss equaled $34,755. In addition, evidence was offered at trial which suggested that plaintiff and his family suffered hardship as a result of his inability to find alternative employment. We cannot say that our collective 'conscience' is shocked by such an award under these circumstances. Moreover, it is well established that punitive damages are available in a Sec. 1983 action. See, e.g., Smith v. Wade, 461 U.S. 30 (1983). We find no basis for overturning the jury's award of $16,000 in punitive damages in this case.
 
 
 21
 Finally, defendants argue that any damages awarded for the violation of the Tennessee Constitution should be reversed because the district court lacked jurisdiction over plaintiff's state law claims. This argument is without merit. In paragraph 30 of plaintiff's complaint, he specifically alleged violations of both the federal constitution and the Tennessee Constitution. See App. 15. Both plaintiff's state and federal claims were based on the identical factual circumstances, and thus, the district court was free to exercise its discretion to assert pendent jurisdiction over related state law claims. See United Mineworkers of America v. Gibbs, 383 U.S. 715 (1966).
 
 
 22
 For the foregoing reasons, the jury verdict in favor of plaintiff is AFFIRMED.
 
 
 
 *
 Honorable Richard F. Suhrheinrich, United States District Court, Eastern District of Michigan, sitting by designation
 
 
 [1]
 The following excerpts were taken from the a transcript of the June 3, 1984, radio broadcast:
 INTERVIEWER: Now, I use [sic] that word conspiracy earlier. If there is a conspiracy, what is the object of it?
 PLAINTIFF: Well, let's go back to Assistant Commissioner Paul Humphries. When I think about the Assistant Commissioner, I have to think about Adolph Hitler of Germany back during the old regime. Paul Humphries came into the Department of Corrections as a counselor at Spencer Youth Center. During this particular time, Paul Humphries' supervisor was a Mr. Fred Barker who is the associate director of programing at Spencer, at the present time. Paul Humphries and Mr. Barker, they didn't somewhat get along too well. There was some problems there. Paul Humphries developed somewhat of a hit list in that when Paul Humphries became the Associate Director of Group Life, he continued to, what, move upward within the Department. When Paul Humphries arose and became the Assistant Commissioner of Youth Services, he set out to what, to eliminate certain people at Spencer Youth Center. Now how . . .
 INTERVIEWER: Do you really believe that?
 PLAINTIFF: Not only I. This is the belief of the coalition. Of those other blacks who are gainfully employed at Spencer Youth Center. Now how do you deal or how do you rid yourself of certain individuals? Well, first of all, Mr. Brown, in order to justify a termination, you've got to set the person up to be a failure. Now how do [you] set a person up to fail? You do it by creating overcrowded conditions, you do it by transferring classification to Spencer Youth Center, you do it by bringing the girls from Highland Rim to Spencer Youth Center. You set him up to be a failure. You break down their disciplinary board that deals with student behavior. Set them up to be a failure. They'll feel pressured. Sooner or later, they will resign.
 INTERVIEWER: Now, that seems a bit negative. Set them up to be a failure. If it is a failure, then that would look bad for his administration, to have a program that is a failure.
 PLAINTIFF: Not when you can camouflage your activity. Let's go to the year 1981. The year 1981, as I said earlier, Spencer Youth Center was at an all-time high in reference to blacks employed, in administration as well as among the lionstaff [sic]. The blacks working at Spencer possessed a surplus amount of college degrees, both undergraduate and graduate degrees. The treatment approach and our disciplinary approach was highly successful. There were many reward programs, there were many incentive programs. Created by whom? The black employees gainfully employed at Spencer.
 . . .
 Mr. Mike Slaughter comes to Spencer The director of Spencer at this very time. Now Mr. Slaughter comes to us by way of Turney Center, West Tennessee. Mr. Slaughter has a reputation of slaughtering people . . .
 INTERVIEWER: That is a bad reputation to have
 . . .
 PLAINTIFF: Or eliminating people . . .
 INTERVIEWER: I am still trying to figure out how legitimate you are here in terms of addressing these particular issues that involve . . . Does this coalition address any matters or subjects other than Spencer?
 PLAINTIFF: Well, we are a new organization and we were founded at Spencer Youth Center and, at present, we are in a struggle with the Department of Corrections trying to solve some of the many issues that we are discussing today.
 App. 274-76.